# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA
# NORTHWESTERN DIVISION

| | |
|---|---|
| YVONNE MOTE *as the personal representative of the estate of Shane Watkins* ) ) ) ) | |
| Plaintiff, ) | Case No.: 3:17-cv-0406-LCB |
| ) | |
| v. ) | |
| ) | |
| STEVEN MOODY and GENE MITCHELL ) | |
| Defendants. | |

## **MEMORANDUM OPINION**

Plaintiff Yvonne Mote, as the personal representative of the estate of Shane Watkins[1], brings this action under Title II of the Americans with Disabilities Act ("ADA") and § 504 of the Rehabilitation Act, against Sheriff Gene Mitchell in his official capacity as the Sheriff of Lawrence County, Alabama. Mote also brings an excessive-force claim under 42 U.S.C. § 1983, against Deputy Sheriff Steven Moody in his individual capacity. Before the Court is Defendant Mitchell's motion for summary judgment as to all claims asserted against him. (Doc. 27). The motion has been fully briefed by all parties. Mitchell argues that he is entitled to Eleventh Amendment immunity and, alternatively, that the undisputed facts do not support a claim under either the ADA or the Rehabilitation Act. For the

---

[1] Yvonne Mote is Shane Watkins's sister.

reasons that follow, the Court finds that Mitchell's motion for summary judgment is due to be **GRANTED**.

## I. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). To demonstrate that there is a genuine dispute as to a material fact that precludes summary judgment, a party opposing a motion for summary judgment must cite "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c)(1)(A). "The court need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3).

When considering a summary judgment motion, the Court must view the evidence in the record in the light most favorable to the non-moving party and draw reasonable inferences in favor of the non-moving party. *White v. Beltram Edge Tool Supply, Inc.*, 789 F.3d 1188, 1191 (11th Cir. 2015). "[A]t the summary judgment stage[,] the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "'Genuine

disputes [of material fact] are those in which the evidence is such that a reasonable jury could return a verdict for the non-movant. For factual issues to be considered genuine, they must have a real basis in the record.'" *Evans v. Books-A-Million*, 762 F.3d 1288, 1294 (11th Cir. 2014) (quoting *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996)). "A litigant's self-serving statements based on personal knowledge or observation can defeat summary judgment." *United States v. Stein*, 881 F.3d 853, 857 (11th Cir. 2018); *see Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253 (11th Cir. 2013) ("To be sure, Feliciano's sworn statements are self-serving, but that alone does not permit us to disregard them at the summary judgment stage."). Even if the Court doubts the veracity of the evidence, the Court cannot make credibility determinations of the evidence. *Feliciano*, 707 F.3d at 1252 (citing *Anderson,* 477 U.S. at 255). However, conclusory statements in a declaration cannot by themselves create a genuine issue of material fact. *See Stein*, 881 F.3d at 857 (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

In sum, the standard for granting summary judgment mirrors the standard for a directed verdict. *Anderson*, 477 U.S. at 250 (citing *Brady v. Southern R. Co.*, 320 U.S. 476, 479–480 (1943)). The district court may grant summary judgment when, "under governing law, there can be but one reasonable conclusion as to the verdict." *Id.* at 250. "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party . . . . If the evidence is merely colorable, or is not

significantly probative, summary judgment may be granted." *Id*. at 249–50 (internal citations omitted).

## II. Statement of Facts

### A. Background

It is undisputed that Shane Watkins was shot and killed by Deputy Steven Moody of the Lawrence County Sheriff's Department. The plaintiff alleges that Watkins had multiple psychiatric diagnoses, including schizophrenia, and that he was in a mental health crisis prior to and at the time of the shooting. On the morning of March 19, 2015, Shane Watkins's mother, Maudie Watkins, called 911 after Mr. Watkins, armed with a box cutter[2], threatened to commit suicide and kill the family dog. (Watkins's deposition, at 45). It is also undisputed that Mr. Watkins maintained possession of the box cutter throughout the duration of the incident. Deputy Moody was the first officer to respond to the Watkins' residence and was aware that Mr. Watkins had threatened to commit suicide and that, at some point, had been armed with a knife or box cutter. Shortly after he arrived, Deputy Moody shot Mr. Watkins outside of the house.

---

[2] At various points in the depositions and pleadings, the parties refer to the object in Watkins's hand as both a box cutter and a knife. For clarity, the Court will refer to the object as a box cutter in this memorandum opinion.

4

The parties' allegations significantly diverge as to the events that occurred after Deputy Moody arrived at the scene.[3] According to Deputy Moody, he received a dispatch requesting assistance with a domestic violence issue in which weapons were potentially involved. (Moody's deposition, at 118). After arriving at the Watkins' residence, Moody stated that he walked to the door and briefly spoke with Mr. Watkins in a calm manner. However, Moody stated that Mr. Watkins then pulled out a box cutter and began yelling, "'Fuck you. Shoot me,'" while moving toward him. (Moody's deposition, p. 65). According to Moody, Watkins was moving toward him faster than he was able to back pedal away. (Moody's deposition, at 35). After backing up for approximately 40-50 feet, Moody stated that he shot Watkins at a range of four to eight feet. (Moody's deposition, at 39). Moody claimed that he repeatedly told Watkins to drop the box cutter as he backed away from him. (Moody's deposition, at 86). Just before Moody fired his weapon, another deputy, Shannon Holland, arrived on the scene. According to Moody, Holland also drew his weapon and yelled at Mr. Watkins to drop the box cutter.

Ms. Watkins's version of the events is quite different. According to Ms. Watkins, Mr. Watkins was standing outside of the house on a concrete parking pad when Deputy Moody pulled his vehicle into her driveway. Ms. Watkins stated that

---

[3] Defense counsel did not move for summary judgment as to Deputy Moody.

Deputy Moody got out of his vehicle with his gun already drawn, moved around to the front of his vehicle for no reason, and immediately fired four shots at Mr. Watkins without ever telling him to drop the knife. (Watkins's deposition, at 48-49). According to Ms. Watkins, she begged Moody not to shoot her son. (Watkins's deposition, at 49). Ms. Watkins testified that Moody and another officer then moved Mr. Watkins's body from the parking pad so that it would be closer to Moody's vehicle. (Watkins's deposition, at 70-72). Ms. Watkins believes that the officers moved the body to make it look like Mr. Watkins had charged at Moody.

### B. Undisputed Facts Pertaining to Sheriff Mitchell

As to Sheriff Mitchell, it is undisputed that he was the Sheriff of Lawrence County at all times relevant to this case. It is also undisputed that he was not present at the scene. Mitchell's only connection to this case arises from his role as the Lawrence County Sheriff. The allegations against Mitchell revolve around the plaintiff's contention that Mitchell refused and/or failed to train his deputies in the proper handling of the mentally ill. *See* (Doc. 1, at 6-7)("Defendant Mitchell also violated the ADA by failing to train deputies regarding the handling of mentally ill persons like Watkins."). Therefore, the plaintiff says, Mitchell failed to accommodate Watkins under the ADA and the Rehabilitation Act. The plaintiff

also claims that Mitchell, through the actions of Deputy Moody and Deputy Holland, is liable for failing to accommodate Mr. Watkins's disability.

**III. Discussion**

This Court is skeptical of whether the allegations in the present complaint support a claim under either the ADA or the Rehabilitation Act, and it does not appear that the Eleventh Circuit has addressed the application of those statutes to a similar set of facts. As will be discussed below, the plaintiff's theory of liability as to Sheriff Mitchell is not entirely clear. However, the claims against Sheriff Mitchell can be disposed of without determining whether such claims exist. As set out below, Sheriff Mitchell is immune under the Eleventh Amendment from the particular ADA claims raised in this case. As to the Rehabilitation Act claim, there is no evidence in the record supporting the plaintiff's allegation that Sheriff Mitchell failed to train his deputies in handling the mentally ill. The plaintiff's failure-to-train allegation underpins her central contention that Mitchell violated the statutes in question by failing to accommodate Watkins's disability. Thus, failing to establish that fact would be fatal to her claims against Mitchell.

   **A. ADA Claims**

As noted, the plaintiff alleged that Sheriff Mitchell, in his official capacity, violated Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131, *et seq*. In its motion for summary judgment, the defense generally argued that the

7

Eleventh Amendment barred both the ADA claim and the Rehabilitation Act claim. The plaintiff completely ignored that argument in her response and failed to provide the Court with anything suggesting that her claims against Sheriff Mitchell were not barred.

The Eleventh Amendment to the United States Constitution provides: "The Judicial Power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. The Amendment not only bars suits against a state by citizens of another state, but also bars suits against a state initiated by that state's own citizens. *See Edelman v. Jordan,* 415 U.S. 651, 663 (1974).

It is well settled that the Eleventh Amendment also applies in situations in which an "arm of the State" is sued. *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280 (1977)("The bar of the Eleventh Amendment to suit in federal courts extends to States and state officials in appropriate circumstances, but does not extend to counties and similar municipal corporations.")(Internal citations omitted). In *McMillian v. Monroe Cty., Ala.*, 520 U.S. 781, 793 (1997), the United States Supreme Court concluded that "Alabama sheriffs, when executing their law enforcement duties, represent the State of Alabama, not their counties." Therefore,

Sheriff Mitchell is an "arm of the State" and is entitled to Eleventh Amendment immunity under most circumstances.

In *Fla. Ass'n of Rehab. Facilities, Inc. v. State of Fla. Dep't of Health & Rehab. Servs.,* 225 F.3d 1208, 1219–20 (11th Cir. 2000), the Eleventh Circuit discussed an exception to Eleventh Amendment immunity:

> Under the doctrine of *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), there is a long and well-recognized exception to this rule for suits against state officers seeking prospective equitable relief to end continuing violations of federal law. *See Summit Med. Assocs., P.C. v. Pryor,* 180 F.3d 1326, 1336–37 (11th Cir.1999)(citing *Idaho v. Coeur d'Alene Tribe,* 521 U.S. 261, 269, 117 S.Ct. 2028, 2034, 138 L.Ed.2d 438 (1997) ("We do not ... question the continuing validity of the *Ex parte Young doctrine*.")), *cert. denied,* 529 U.S. 1012, 120 S.Ct. 1287, 146 L.Ed.2d 233 (2000). The availability of this doctrine turns, in the first place, on whether the plaintiff seeks retrospective or prospective relief.
>
> *Ex parte Young* has been applied in cases where a violation of federal law by a state official is ongoing as opposed to cases in which federal law has been violated at one time or over a period of time in the past. Thus, *Ex parte Young* applies to cases in which the relief against the state official directly ends the violation of federal law, as opposed to cases in which that relief is intended indirectly to encourage compliance with federal law through deterrence or simply to compensate the victim. "'Remedies designed to end a continuing violation of federal law are necessary to vindicate the federal interest in assuring the supremacy of that law. But compensatory or deterrence interests are insufficient to overcome the dictates of the Eleventh Amendment.'" *Summit Med. Assocs.,* 180 F.3d at 1337 (quoting *Papasan v. Allain,* 478 U.S. 265, 277–78, 106 S.Ct. 2932, 2940, 92 L.Ed.2d 209 (1986)). Therefore, the Eleventh Amendment does not generally prohibit suits against state officials in federal court seeking only prospective injunctive or declaratory relief, but bars suits seeking retrospective relief such as restitution or damages. *See Green v. Mansour,* 474 U.S. 64, 68, 106 S.Ct. 423, 426, 88 L.Ed.2d 371

(1985); *Sandoval v. Hagan,* 197 F.3d 484, 492 (11th Cir.1999) ("[I]ndividual suits that seek prospective relief for ongoing violations of federal law ... may be levied against state officials."). If the prospective relief sought is "measured in terms of a monetary loss resulting from a past breach of a legal duty," it is the functional equivalent of money damages and *Ex parte Young* does not apply. *Edelman,* 415 U.S. at 669, 94 S.Ct. at 1347.

In the present case, the plaintiff is not seeking prospective injunctive or declaratory relief. A review of the complaint reveals that the plaintiff specifically seeks compensatory damages, pre- and post-judgment interest, court costs, attorneys' fees, and expert-witness fees. (Doc. 1, at 7-8). Accordingly, *Ex parte Young* does not apply. Therefore, the Eleventh Amendment bars the plaintiff's claims against Sheriff Mitchell brought under the Americans with Disabilities Act. *See also Onishea v. Hopper*, 171 F. 3d 1289, 1292, 1296 n. 11 (11th Cir. 1999)(finding that the plaintiffs' requested relief, i.e., that the court "force integration of recreational, religious, and recreational programs" was "within the fiction of *Ex parte Young* …, and that the Eleventh Amendment [was] therefore not an issue in th[e] case."); *Adkison v. Willis*, 214 F. Supp. 3d 1190, 1196, n. 4 (N.D. Ala. 2016)("Because Mr. Adkison seeks prospective injunctive relief rather than money damages, the Eleventh Amendment does not bar Mr. Adkison's claim."). Consequently, this Court lacks jurisdiction over the plaintiff's ADA claims, and summary judgment is due to be granted.

### B. Rehabilitation Act Claims

The Eleventh Amendment, however, does not bar the plaintiff's claims under the Rehabilitation Act. 42 U.S.C. § 2000d-7 provides that "[a] State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of section 504 of the Rehabilitation Act of 1973, … or the provisions of any other Federal statute prohibiting discrimination by recipients of Federal financial assistance." Citing this statute, the Eleventh Circuit has concluded that states that accept federal funding waive Eleventh Amendment immunity for Section 504 Rehabilitation Act claims. *See Garrett v. Univ. of Ala. at Birmingham Bd. of Trs.,* 344 F.3d 1288, 1290–93 (11th Cir. 2003)("Section 2000d-7 unambiguously conditions the receipt of federal funds on a waiver of Eleventh Amendment immunity to claims under section 504 of the Rehabilitation Act. By continuing to accept federal funds, the state agencies have waived their immunity.") The parties in the present case stipulated that "on March 19, 2015, the law enforcement program of Gene Mitchell, in his official capacity as the Sheriff of Lawrence County, Alabama, was a recipient of federal funds and, therefore, subject to § 504 of the Rehabilitation Act…." (Doc. 25). Accordingly, the Court turns now to Sheriff Mitchell's summary judgment claim as it relates to the plaintiff's claims under the Rehabilitation Act.

In her complaint, the plaintiff alleged that Sheriff Mitchell violated the Rehabilitation Act "through the actions of [Deputy] Moody and the deputy

11

assisting him" by failing to accommodate Watkins. (Doc. 1, at 7). The plaintiff also alleged that "Mitchell failed to train deputies regarding the handling of mentally ill persons like Watkins." *Id.* In his motion for summary judgment, Mitchell argues, among other things, that "failure to train" is not a viable claim under the Rehabilitation Act. (Doc. 28, at 10). In her response, the plaintiff "agrees that her failure to train allegations are not properly treated as separate claims, though they are relevant to the failure to accommodate claims." (Doc. 31, at 1). However, on the next page, the plaintiff asserts that her complaint "clearly asserted two separate bases for her ADA and RA claims: 1) discrimination in the form of a failure to accommodate and 2) a failure to train." *Id.* at 2-3. It is unclear to this Court exactly what the plaintiff is arguing. As best the Court can determine, the plaintiff has asserted that Sheriff Mitchell failed to accommodate Watkins's disability by allegedly failing to train his deputies in dealing with the mentally ill, and that Deputy Moody, whose actions she imputes to Sheriff Mitchell, failed to accommodate Watkins at the scene. This failure, the plaintiff says, constitutes a violation of the Rehabilitation Act.

The Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance…." 29 U.S.C.

§ 794(a). Although it is not entirely clear from her pleadings, the plaintiff's main contention[4] appears to be that, because of his mental illness, Watkins was denied the benefits of and/or subjected to discrimination under a program or activity of the Lawrence County Sheriff's Department.

The plaintiff asserted that Deputy Moody was not trained to deal with mentally ill people and, as a result, failed to accommodate Shane Watkins's disability by shooting him. Thus, the apparent accommodation that Moody owed to Watkins was to refrain from shooting him. But police officers are under a duty to refrain from unjustifiably shooting anyone, not just the disabled. Accordingly, the only logical way to interpret the plaintiff's complaint is that Sheriff Mitchell violated the Rehabilitation Act by failing to train his deputies to handle mentally ill persons without resorting to deadly force. Therefore, according to the plaintiff, Watkins was denied the benefit of, or was subjected to discrimination under a program that was receiving Federal financial assistance. However, even assuming that such a claim exists under the Rehabilitation Act, there is no genuine issue of material fact that would allow it to proceed past summary judgment because the record is devoid of any evidence that Sheriff Mitchell "failed to train deputies regarding the handling of mentally ill persons" as alleged in the complaint. (Doc. 1, at 7).

---

[4] The plaintiff also alleged that Watkins was disabled due to his mental illness. The defendants do not dispute that Watkins had a disability.

In his deposition, Sheriff Mitchell testified that all of his deputies "go through the A-Post system." (Mitchell's deposition, at 12).[5] Subsequently, the following exchange occurred:

> "[Plaintiff's counsel]: [I]s there any kind of training that tells officers how to handle -- for example, to de-escalate a situation with a mentally ill person to avoid having to kill them?
>
> "[Sheriff Mitchell]: We – we have that often, not necessarily just for mental health –
>
> "[Plaintiff's counsel]: Where is that?
>
> "[Sheriff Mitchell]: That's a daily occurrence that happens out – it's ongoing.
>
> "[Plaintiff's counsel]: Well, where is the training? Where is it?
>
> "[Sheriff Mitchell]: Well, where was the training that they've all had?
>
> "[Plaintiff's counsel]: What are you talking about?
>
> "[Sheriff Mitchell]: It's in the training they've already had. It's in A-Post. It's in schools we send them to."

(Mitchell's deposition, at 35-36). The plaintiff then goes on to ask whether Sheriff Mitchell conducts <u>additional</u> training at his department that specifically focuses on handling the mentally ill. Sheriff Mitchell readily admits that he has never provided additional training beyond what his deputies receive at APOSTC. However, the fact remains that Mitchell did ensure that his deputies had training in dealing with the mentally ill. Thus, the plaintiff's allegation that Sheriff Mitchell

---

[5] "APOST" or "APOSTC" is an acronym for the Alabama Peace Officers Standard and Training Commission course. (Doc. 17-5, p. 10)

"failed to rain deputies regarding the handling of mentally ill persons" is without support in the record.

Deputy Moody also testified that he received training in dealing with the mentally ill when he attended APOSTC. (Moody's deposition, at 113-14.) According to the plaintiff's own expert's report, Deputy Moody "[c]ompleted the State of Alabama Peace Officers Standard and Training Commission ('APOSTC') course of instruction to become a certified law enforcement officer in March 2009…" (Doc. 17-5, p. 10). The plaintiff's expert also noted that, "[a]ccording to the current APOSTC requirements, recruit officers receive four hours of training in the topic entitled, 'Handling the Emotionally Disturbed.'" (Doc. 17-5, p. 10). The record lacks any evidence suggesting that Sheriff Mitchell completely failed to ensure that his deputies were trained in handling the mentally ill. The plaintiff, as well as her expert witnesses, suggests that Sheriff Mitchell could have done more in the way of training his deputies to interact with mentally ill citizens. However, nothing in the record disputes the fact that Mitchell's deputies, including Moody, received training as to the handling of mentally ill individuals. Accordingly, the crux of the plaintiff's Rehabilitation Act claim, i.e., that Sheriff Mitchell completely failed to train his deputies to deal with the mentally ill, lacks any evidentiary basis. This Court notes that the same defect would be fatal to the plaintiff's ADA claim had it not been barred by the Eleventh Amendment.

15

Viewing all of the evidence in the light most favorable to the plaintiff, as this Court is required to do, there is nothing to suggest that Sheriff Mitchell failed to train his deputies as alleged in the complaint. Under the plaintiff's theory of the case, that failure would be an essential element to establish entitlement to relief. Accordingly, there is no material issue of fact to be determined at a trial regarding the clams against Sheriff Mitchell, and there would be only one reasonable conclusion as to the verdict: that Sheriff Mitchell did not violate the Rehabilitation Act. Therefore, Sheriff Mitchell is entitled to summary judgment on that claim.

For the foregoing reasons, summary judgment is due to be **GRANTED** in favor of Sheriff Gene Mitchell.

**DONE** and **ORDERED** this February 28, 2019.

_____
**LILES C. BURKE**
UNITED STATES DISTRICT JUDGE